**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF NEW YORK**

UNITED STATES OF AMERICA

v.                                                    22 Cr. 513 (PKC)

ALEXANDER VALENCIA GARCIA,

                    Defendant.

### SENTENCING MEMORANDUM OF ALEXANDER VALENCIA GARCIA

Justine Harris
HARRIS TRZASKOMA LLP
156 West 56th St., suite 2004
New York, New York 10019
Tel. 917.685.5622
Jharris@harristrz.com

Krista Staropoli
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, New York 10004
Tel: 212.202.2600
kstaropoli@shertremonte.com

*Attorneys for Alexander Valencia Garcia*

# I.

# INTRODUCTION

Alexander Valencia Garcia, 59 years-old, is a devoted father and grandfather. Born and raised in Colombia, where he has lived most of his life, he learned from an early age how to work hard. His job history is long and varied. Mr. Valencia has worked the assembly line at a metal factory, packaged candy, ran deliveries at a grocery store, sold arepas on the street, refurbished and sold used broken shoes, cleaned offices as a janitor, washed hotel linens at a commercial laundromat, and driven a taxi. Unfortunately, his efforts were never enough to achieve long-term financial stability. Although his income was steady for many years, he struggled to make ends meet and experienced repeated bouts of destitution and homelessness; at one point he was living out of his car. Even when he did have a stable room, he often slept on a mattress on the floor. Repeatedly forced to borrow money to get by, over the years Mr. Valencia racked up high interest debt on credit cards and with personal loans.

It is in these circumstances that in January 2020, when one of Mr. Valencia's grandchildren required specialized medical attention and his debts had once again begun to spiral out of control, Mr. Valencia helped his brother, co-defendant Cesar Valencia Garcia ("Chucho"), in connection with a three-day drug operation outside of Popayan, Colombia. Specifically, Mr. Valencia assisted a team of approximately 10 to 12 people with the packaging and branding of at least 450 kilos of cocaine. His crime was serious, and he in no way seeks to minimize his conduct. Yet Mr. Valencia proved to be of limited value to the criminal enterprise and was paid a relatively modest amount – approximately $1200. Moreover, his involvement was short-lived.

1

Profoundly ashamed of his conduct, he resumed driving a taxi and in 2022, and later came to the United States, where he worked long days in a commercial laundromat.

Mr. Valencia was arrested in Miami on November 7, 2023, and on May 1, 2025, accepted full responsibility for his actions and pled guilty to conspiring to violate 21 U.S.C. § 959(d), prohibiting the distribution of drugs knowing that they will be imported into the United States. His advisory guidelines are 57 to 71 months. Given his limited role in the criminal conduct – the government and Probation agree that he is eligible for both safety valve and a minor role adjustment – as well as his enormously difficult personal history, a time-served sentence is appropriate. A fundamentally good and kind person, Mr. Valencia has worked hard for decades at low paying and honest employment, and his involvement in his brother's drug organization is at odds with his long, law-abiding history. He thus presents no risk of recidivism, and a lengthy jail sentence is not needed to achieve specific deterrence. Moreover, his time at the MDC has been onerous and already imposed substantial punishment. His daughters have been able to visit only once, and because of separation orders, he has only seen his son in passing twice, both times at a distance and without an opportunity to greet him. He has struggled with myriad health problems, including a serious circulation condition that causes pain and bruising in his legs, and heart irregularities and chest pain that remain undiagnosed. Especially given that the quantity of

drugs involved in this case bear little relation to Mr. Valencia's role, a guidelines sentence would be greater than necessary to achieve the statutory goals of sentencing.[1]

## II.

## MR. VALENCIA'S PERSONAL HISTORY AND CHARACTERISTICS

### A.    Mr. Valencia's Difficult Personal History and Long Record of Lawful Employment in Colombia

Mr. Valencia's childhood in Colombia was difficult.  Hernando Valencia, Mr. Valencia's father, worked as a cleaner and messenger at Banco de la Republica, *see* PSR ¶¶ 37, 40, and his mother, Aida Garcia, stayed at home to raise Mr. Valencia and his four siblings.[2]  Hernando struggled with alcohol addiction and physically abused Ms. Garcia.  On one occasion, Mr. Valencia recalls his father grabbing his mother by the hair, throwing her down, and dragging her on the floor.  Mr. Valencia would sometimes attempt to intervene, but as a child was rarely successful at preventing the violence. As a result of his father's abuse, Mr. Valencia was often "on edge" and afraid, never sure when his father's temper would erupt.  *Id.* at ¶ 40.  Mr.

---

[1] Attached in support of this application are fifteen letters of support for Mr. Valencia, including: his father, H. Valencia (written with assistance) (Ex. A); his daughter Paula Valencia (Ex. B); his former wife, Martha Florez (Ex. C); his former sister-in-law, Sara Beatriz Florez (Ex. D); his daughter, Maria Jose Valencia Florez (Ex. E); his son-in-law, D. Steven Lopez Cruz (Ex. F); Deisy Azucena, another former sister-in-law (Ex. G); Jaime Florez (Ex. H); his former coworker at the laundromat, Harold Borjes (Ex. I); his daughter-in-law, Laura Rodriguez (Ex. J); his brother-in-law, Jaime Paiba (Ex. K); his niece, Nelly Florez (Ex. L); his former mother-in-law, Nelly Martinez (Ex. M); another niece, Nicole Valencia (Ex. N); and his former sister-in-law, Yasmin Florez Rivera (Ex. O).

[2] The PSR indicates Mr. Valencia is one of four siblings; however, he is in fact one of five.

3

Valencia's parents separated when he was 10, and he and his siblings were primarily raised by his mother. While his father provided some financial support, Ms. Garcia tried to support the family by working as a janitor at the local movie theater and fostering strong moral values in her children. *Id.* Growing up, religion and spiritual faith were a constant in Mr. Valencia's life. He and his siblings attended church every Sunday. Mr. Valencia has continued this tradition with his own children, and regularly attends services while incarcerated at MDC.

As his friends and family confirm, Mr. Valencia has not gone any notable length of time without working a full-time job. *See, e.g.*, Ex. A, H. Valencia Ltr. (describing his son as always being hard-working and responsible). Although he struggled in school and was repeatedly held back, Mr. Valencia eventually graduated high school at nineteen and immediately began working at a pharmacy, restocking supplies and assisting customers. When he moved to Cali, he worked as a messenger for a learning center, SENA, receiving and handling the learning center's mail. From there, he worked at a candy factory on the assembly line, eventually landing a job with his then-wife, Martha Florez, at a local grocery store. *See* PSR ¶ 60. For a decade, Mr. Valencia and his wife worked at the supermarket. He greeted customers and made bicycle deliveries, *id.*, and she worked the cash register. Eventually, however, the owner retired, and the supermarket closed. Out of work, Mr. Valencia did everything he could to make ends meet and provide for his family. This included selling homemade arepas outside of their apartment – an endeavor he had to abandon after getting sick from repetitive exposure to propane fumes – and buying miscellaneous cosmetic items in bulk and reselling them. *Id.* Through a neighbor, Mr. Valencia obtained an entry level position at Celco, a local metal factory.

4

Although the work was physically challenging, Mr. Valencia worked at Celco for approximately eleven years. *See* PSR ¶ 59. He always worked at least eight hours a day, five days a week, but often worked overtime and on weekends for extra money. He recalls making a little above the minimum wage — $1.3 or 1.4M Colombian pesos ($320 USD) per month. Income was stable, but it was still barely enough to make ends meet, and Mr. Valenca and his family lived paycheck to paycheck.

At the center of Mr. Valencia's life, and the motivation for all his hard work, was his family. After getting married at twenty-three, he and Martha had three children: Paula, Maria Jose, and Oscar. From the beginning, financial strains on the family were immense. They lived humbly, in a small two-bedroom apartment in Cali, Colombia. They had few appliances – just a small television, a refrigerator, and a blender – and washed their clothes by hand. The family was often behind on their rent, and Mr. Valencia frequently had to ask their landlord for additional time to make the payments.

For most of his life, Mr. Valencia confronted poverty with resourcefulness and a positive energy animated by spiritual faith. In her letter, Mr. Valencia's oldest daughter Paula recounts a childhood memory when Mr. Valencia didn't have enough money to buy groceries; humiliated, he walked around the neighborhood attempting to sell an old typewriter so that he could afford to buy food. It was very hot that day, and no one took him up on the offer. Paula writes, "We sat down to rest at the entrance of a supermarket and when I looked down, I found $20,000 Colombian pesos lying next to me. When I told my father, he hugged me tightly and smiling said, 'God never fails.'" Ex. B, P. Valencia Ltr.

5

Still, a positive attitude could not solve all problems, and the burdens of poverty took a toll on the family. The distress of the family's finances caused fissures in his marriage, and Mr. Valencia and his wife separated. Nonetheless, Ms. Florez is still an integral part of Mr. Valencia's life and remains supportive. She emphasized in her letter to the Court that Mr. Valencia was "always willing to work no matter how hard it was, so that his children and I would never suffer any hardship." Ex. C, M. Florez Ltr. *See also* Ex. D, S. Beatriz Florez Ltr. ("After starting his home, he always worked hard and was responsible for his family.").

## B.    Mr. Valencia's Poverty and Homelessness

For Mr. Valencia, the separation from his wife was a turning point. Newly single, Mr. Valencia had to find his own place to live, exacerbating his financial distress. He settled on a one-room apartment in Cali, Colombia. Unable to afford basic furniture, he slept on a mattress



on the floor; rats and bugs were frequently present. S*ee* PSR ¶ 41. He also lived far from his ex-wife and children, who had moved to LaFlora, nearly forty minutes away.

Life became even more difficult when, in approximately 2015, the metal factory relocated about two hours away from Mr. Valencia's home, requiring him to pay for transportation to and from the worksite. The commuting costs were prohibitive, and when Celco

refused to give him a raise, Mr. Valencia had no choice but to leave the job and begin driving a taxi. To make ends meet, he took out loans and used credit cards to cover his necessities and continue to help his children. But his unpaid debts collected interest, his children continued to need assistance, and the money pressures mounted. He began receiving threats from creditors, propelling him into a state of panic and desperation. He worked even harder. He purchased broken shoes in bulk, fixed them, and, when he was not driving his taxi, sold them on a street corner.

Mr. Valencia hit rock bottom when he separated from a girlfriend and had nowhere to live. Without her financial assistance, he had no choice but to sleep in his car. *See* PSR ¶ 41. Eventually, his children, who by then were in their twenties, discovered how he was living and insisted that he stay with them until he found something more stable. Mr. Valencia was ashamed of his situation but moved in with his eldest daughter and her husband – Paula and Steven – for about a year in LaFlora. He continued to work as a ride-share driver, earning approximately $2.00–3.00 USD per trip. To make ends meet, on top of driving, he would buy items in bulk and resell them for a marginal profit.

In 2019, Mr. Valencia had a lucky break — the opportunity to work in Florida. Living with family members, he worked installing sprinkler systems through a landscape company, GRC Irrigation. While doing that full-time, Mr. Valencia also worked as an unofficial taxi driver. *See* PSR ¶ 58. He borrowed his daughter's car and offered rides to people in his neighborhood, to go to and from work or school.

7

After five months in the United States, Mr. Valencia returned to Colombia with approximately $1,500 to $2,000 USD saved. Although he planned to use that money to buy a car so that he could work as a taxi driver again, it was not enough, and given his credit card debt and unpaid loans, he did not qualify for a car loan. He had to again rent a taxi, giving the owner a significant portion of his proceeds, which made it impossible to get ahead of the interest accumulating on his debts each month.

## C.    Mr. Valencia's Involvement in the Offense Conduct

It is at this vulnerable time that Mr. Valencia became involved with his brother's drug business. Not only was he facing increasing pressures from creditors, but his infant granddaughter – Oscar's first child – needed specialized medical attention not covered by insurance to treat dysplasia in her spine. *See* PSR ¶ 18. Afraid of losing his newfound stability, and eager to ensure his son's family had what they needed for their child's medical care, Mr. Valencia asked Chucho for a loan.[3] When his brother refused, Mr. Valencia offered to work for him in exchange for pay. His brother agreed, and for several days in January 2020, Mr. Valencia served as the intermediary between his brother and the "chemist" (who was producing the cocaine) and the team subsequently packaging it. Together with his son, Oscar, he stayed with the workers for several days, fielding phone calls from his brother and, when

---

[3] Notably, since Mr. Valencia and Oscar have been arrested, Oscar's wife has not been able to afford their daughter's medical treatment, leaving their daughter in constant pain in her legs, feet, and hip.

appropriate, communicating instructions about how the cocaine should be packaged and branded. *See* PSR ¶ 15. However, the recordings make clear that Mr. Valencia was ill-equipped to handle even this most basic task. Mr. Valencia struggled to remember straightforward details of his assignment, including, for example, what brands should be used on what drugs. Frustrated, and after expressing concern that Mr. Valencia could not follow through with his tasks, his brother asked to speak to others present to confirm the same details. On January 30, 2020, shortly after the drugs had been loaded onto a truck, the shipment was seized by the Colombian National Police. *See* PSR ¶ 9. Based on the recorded phone calls, it seems that Mr. Valencia was one of the last to find out.

There is no evidence that Mr. Valencia had any further involvement in drug dealing. He had no connection to the second seizure in August 2020, *id.* ¶ 15, and, after the slowdown of the pandemic (during which Mr. Valencia endured repeated and serious bouts of Covid), Mr. Valencia returned to driving a taxi. He did that work until February 2022, when a passenger held a knife to his neck and threatened to kill him unless he handed over his money and his cell phone.[4] Terrified, Mr. Valencia returned to the United States.

Immediately upon arriving, Mr. Valencia again secured a job, this time in a commercial laundromat cleaning linens for hotels. He spent nearly all the money he earned on his children – buying food and diapers for his infant grandson – and sending whatever he could back to

---

[4] Mr. Valencia's PSR objections note a correction to Paragraph 58 of the PSR, indicating that Mr. Valencia was held at knife point in Colombia, not the United States. *See* July 11, 2025 PSR Objections at p. 2.

Colombia to help his son, Oscar, who was struggling to support his family.  *See* Ex. B, P. Valencia Ltr. (describing how Mr. Valencia used his money from the laundry to help his children).  Indeed, the $14/hour laundromat salary was the most money he had ever made in his life.  And despite working more than fifteen-hour days on his feet, with circulation issues in his legs, he would feed, watch over, and play with his grandson when he came home.  *See* Ex. E, M. Jose Ltr. (describing how the laundry work was very physically challenging, but Mr. Valencia still prioritized his grandson at home).

Mr. Valencia was arrested on these charges in Florida on November 7, 2023.

## III.

## THE GUIDELINES CALCULATION

On May 1, 2025, Mr. Valencia accepted full responsibility for his actions and pled guilty to conspiring to violate 21 U.S.C. § 959(d), prohibiting the distribution of drugs knowing that they will be imported into the United States.  *See* PSR ¶ 1.  Although the offense carries a mandatory minimum sentence, Mr. Valencia qualifies for the safety valve under 18 U.S.C. § 3553(f).  Accordingly, there is no mandatory minimum, and the applicable guidelines are set out in USSG §2D1.1.  *See* PSR ¶ 14.

The Probation Department calculated the guidelines as follows:

**Base Offense Level:** Since the offense involved 455 kilograms of cocaine, but Mr. Valencia receives a mitigating role adjustment (*see* PSR ¶ 15), the base offense level is reduced from 38 to **34.**  *See* USSG §2D1.1(a)(5) and (c)(1).

**Specific Offense Characteristics:** Mr. Valencia meets the criteria set forth in USSG §5C1.2 and therefore receives the "safety valve" reduction under USSG §2D1.1(b)(18): **-2**

**Adjustment for Role in the Offense:** Under USSG §3B1.2(b), Mr. Valencia was a minor participant in the offense reducing his offense level by two levels: **-2**

**Acceptance of Responsibility:** Under USSG §3E1.1(a) & (b), Mr. Valencia has demonstrated acceptance of responsibility for the offense and notified the government in a timely manner of his plea, reducing his offense level by three levels: **-3**

**Chapter Four Adjustment:** Mr. Valencia is a Zero-Point Offender under USSG §§4C1.1(a)(1)–(10), reducing his offense level by two: **-2**

**Total Offense Level: 25**

`       Based upon a total offense level of 25 and a criminal history category of I, the advisory Guideline imprisonment range is 57 months to 71 months.

## IV.

## THE § 3553 FACTORS WARRANT A SENTENCE OF TIME-SERVED

As the Court knows, district courts have an "overarching duty 'to impose a sentence sufficient, but not greater than necessary,' to serve the purposes of sentencing." *Pepper v. United States*, 562 U.S. 476, 492 (2011) (quoting 18 U.S.C. § 3553(a)). Though a sentencing court must consider the guidelines as a "starting point," it must "then make an independent sentencing determination, taking into account the 'nature and circumstances of the offense and the history and characteristics of the defendant,' and all the statutory factors." *United States v. Singh*, 877 F.3d 107, 116 (2d Cir. 2017) (quoting *United States v. Cavera*, 550 F.3d 180, 188 (2d

11

Cir. 2008)).  A district court may not "presume that the Guidelines range is reasonable" and instead "must make an individualized assessment based on the facts presented." *Id.* (quoting *Gall v. United States*, 552 U.S. 38, 50 (2007)).  In doing so, "a sentencing judge must have a generosity of spirit, that compassion which causes one to know what it is like to be in trouble and in pain." *United States v. Singh*, 877 F.3d 107, 121 (2d Cir. 2017) (internal quotation marks omitted).

Here, a non-guidelines sentence of time served is both appropriate and just.  Mr. Valencia accepts full responsibility for his participation in the offense.  Without a doubt, his crime is serious, and he is deeply ashamed of his conduct.  Nevertheless, that the balance of Mr. Valencia's life has been marked by honest and hard work merits the Court's leniency.  He has suffered decades of brutal poverty and has borne the brunt of life's hardships with dignity and perseverance.  While economic desperation in no way excuses criminal conduct, the fact that Mr. Valencia has worked for decades in menial jobs, doing his best to support his family, is testament to his true character, and powerful evidence that a lengthy sentence is not needed to achieve deterrence or impose just punishment.

Moreover, Mr. Valencia has already been amply punished.  Far from family, Mr. Valencia had endured repeated lockdowns and isolation at the MDC, a high security facility. He has also faced serious health problems, including chronic and severe pain in his legs due to circulation issues and repeated cardiac scares related to chest pains and heart irregularities.  *See* PSR ¶ 48, 49.  Finally, the Court should consider that Mr. Valencia's guidelines are largely driven by the quantity and quality of the drugs involved in the offense, factors over which he had

12

no control.  Indeed, he had no ownership in the drugs and was paid very little for his short-lived

and largely ineffectual role in the enterprise.  Given that in this case the advisory drug guidelines

have little bearing on Mr. Valencia's culpability, a guidelines sentence is unnecessary to advance

the goals of sentencing.

## A.    Mr. Valencia's Personal Hardships and Fundamentally Good Character Are Mitigating

It is well established that sentencing courts can consider employment history and prior

good deeds in crafting the appropriate sentence.  *See, e.g.*, *United States v. Gill*, 739 F. App'x 75,

76 (2d Cir. 2018) (noting with approval that the district court properly considered all mitigating

factors, including the defendant's history of employment).  As the 15 attached letters make clear,

despite the enormous financial stresses Mr. Valencia faced throughout his life, he has been

singularly focused on his family — supporting his children emotionally and, whenever he could,

economically.  He is a generous and considerate person who has, but for the conduct giving rise

to this case, lived a law-abiding and productive life.  While good deeds do not negate bad ones,

"weighing the good with the bad" was "plainly part of what Congress had in mind when it

directed courts to consider, as a necessary sentencing factor, 'the history and characteristics of

the defendant.'"  *United States v. Adelson*, 441 F. Supp. 2d 506, 513-14 (S.D.N.Y. 2006),

*aff'd*, 301 F. App'x 93 (2d Cir. 2008) (citing 18 U.S.C. § 3553(a)(1) and considering defendant's

lifelong history of integrity, generosity, and compassion).

Here, the good far outweighs the bad. As each of the letters emphasizes, Mr. Valencia, despite his very limited means, thinks first of others and often went without so his family could have more. Whenever he had a little extra, he would invite his children to join him at a bakery for a treat; he would never order for himself and assured his children that he was not hungry or that he had already eaten. *See* Ex. F, D. Steven Lopez Cruz Ltr. His son-in-law explains: "Alexander is the kind of person who prefers not to eat himself, but wants his children to have everything they need. His family and loved ones have always been his priority." *Id.*

A consistent theme in the attached letters is Mr. Valencia's kindness. He is quick with a smile, concerned about others' well-being, and always focused on the positive. His temperament is perhaps best summed up by his sister-in-law, Deisy Azucena: "He is tolerant, rarely angry, and forgives easily. He makes friends easily. For him, the most important thing is his family and GOD. His children and grandchildren are his greatest strength." Ex. G, D. Azucena Ltr; *see also* Ex. H, J. Florez Ltr. ("His home was always our refuge, his smile a promise of peace, his intelligence and positive energy a magnet that made anyone, no matter who they were, feel instantly at home."). As his former wife Martha Florez noted in her support letter, while he

could not always give financially, he was unfailingly generous with his love: "[h]e was a completely present father, no matter the circumstances, always doing everything for his children, humbly giving them the best and ensuring they lacked nothing. Our children always found unconditional support and, above all, a lot of love in him." Ex. C, M. Florez Ltr. Indeed, even from jail, Mr. Valencia works hard to maintain his bond with his family members; he speaks nightly to his two-year-old grandson, and sings him a song every time he has to say goodbye. *See* Ex. E, M. Jose Ltr.

But Mr. Valencia's kindness extends beyond his family. He endeavors to be a welcoming and positive presence in every situation. One of his coworkers from the laundry in Florida writes that Mr. Valencia is a "great person" who is "deserving of good things," and that Mr. Valencia's absence has left behind an "enormous" void. *See* Ex. I, H. Borjes Ltr. ("It's been 10 years in this country, and never in any other person have I been able to find such beautiful values as in Alexander. No one has ever welcomed us with love and respect like he did."). Mr. Valencia's son-in-law, Steven, recalls that even when he had little himself, "he always carried a few coins in his pocket to give to people on the street." Ex. F, D. Cruz Ltr.

Mr. Valencia's steadfast spirit is all the more remarkable given the extent of his own personal struggles. Childhood domestic violence, decades of menial and low-wage work, bouts of homelessness and destitution, and crushing debt have all been defining features of his life. These hardships were exacerbated by Mr. Valencia's health problems, including lung inflammation from the petrol fumes when selling arepas, heart and cardiovascular issues, and diabetes. Yet throughout, he has gone to great lengths to shield his family from his own

15

suffering, and even when he had practically nothing, made every effort to give what he could to his children. As his daughter-in-law notes, Mr. Garcia is "completely devoted to his children, body and soul. He's a father who has only focused on filling his children with love and well-being." Ex. J, L. Rodriguez Ltr.

In short, there is little need to prolong Mr. Valencia's incarceration. His involvement in drugs is limited to several days in 2020. Both before that time and since, Mr. Valencia's life has been defined by hard and honest work. It speaks volumes that when he was arrested in Florida on international narcotics charges, Mr. Valencia was working fifteen-hour days in a commercial laundromat and sharing a bedroom with his one-year-old grandson. He presents no risk of recidivism, as his long record of legitimate employment is the best evidence of his true character.

**B.    Mr. Valencia's Health Problems and Conditions of Confinement at the MDC Merit the Court's Leniency**

This Circuit has recognized that a sentencing court may vary downward to account for a defendant's poor health, especially when the health problems require treatment and monitoring by the Bureau of Prisons. *See, e.g., United States v. Rioux*, 97 F.3d 648 (2d Cir. 1996) (noting defendant's kidney disease and double hip replacement, which required "monitoring" as basis for downward departure); *see also United States v. Roth*, No. 94 CR. 726 (RWS), 1995 WL 35676, at *1 (S.D.N.Y. Jan. 30, 1995) (finding defendant's condition would worsen and lead to profound physical impairment while incarcerated).

Here, Mr. Valencia suffers from a host of medical conditions that warrant this Court's consideration. He has Type II diabetes, chronic erysipelas – a vascular condition that creates

16

painful inflammation, swelling, bruising and hardening of his legs – and various heart conditions, including a murmur and a history of experiencing a "pre-heart attack." These conditions are chronic, and the swelling in his legs cause him severe pain and immobility. On top of that, he contracted Covid-19 three times during the pandemic and still suffers from some of its long-term effects.

The MDC has not monitored these conditions effectively. *See* PSR ¶ 48. Not only has the erysipelas spread – his legs are consistently swollen and discolored – but his pain has intensified. More recently, he has been experiencing severe chest pains, *see id.* ¶ 49, and was taken to the hospital for evaluation and tests. The restrictions on his movement at the MDC as well as the limited diet have only worsened his conditions — frequent lockdowns and the separation orders make prison life, already difficult, that much harder. Although he has repeatedly sought medical attention, often with the aid of his counsel, the BOP has not been able to treat his underlying diagnoses, only providing Mr. Valencia a compression sleeve for his leg and inconsistently offer him pain medication. *Id.* ¶ 50. In short, Mr. Valencia is at high risk of a medical emergency that would be better mitigated by doctors in Colombia.

Not only should the Court take into account his extensive and chronic medical conditions, *see* USSG § 5H1.4, but the Court should consider the myriad ways that Mr. Valencia has already been punished. Mr. Valencia's arrest was traumatic. A squad of agents broke down the door in the early morning and took Mr. Valencia away in front of his crying grandson. For the past twenty months, Mr. Valencia has been incarcerated at MDC under the most stringent conditions. His family, struggling without his emotional support, have only been able to see him once, and

then only for a two-hour visit. Heartbroken over the circumstances his son is facing,

Mr. Valencia has only glimpsed him through a prison window, and saw him once in court.

Worried for his son, Mr. Valencia's spirit is broken in a way it never has before; as he is no

longer able to shield his family from his distress, they are terrified for his emotional and physical

well-being. As his daughter states in her letter, from the moment of Mr. Valencia's traumatic

arrest, "happiness ceased to exist for us. We aren't even able to eat peacefully and comfortably

because we're always thinking about my father and my younger brother, wondering if they have

food, if they're okay, and many other things." *See* Ex. B, P. Valencia Ltr.

　　　Mr. Valencia knows he has a long road ahead. Upon his return to Colombia, he will have

to work hard to achieve financial security and maintain his physical health. Yet, he is eager to do

everything he can — not just for himself, but for his family and community, who are ready to

support him as best they can. Indeed, in Mr. Valencia's absence, his children have taken on

some of his financial obligations to try to limit his debt and help clear the slate for when he

returns to Colombia. *See* Ex. B, P. Valencia Ltr. ("With our father's situation, everything got

worse because we had to take on everything alone: debts with banks, credit cards, and even with

people who lend us money in Colombia, charging extremely high interest rates of up to 20%.").

Given that Mr. Valencia has suffered immensely already, and is poised to lead a law-abiding life

in Colombia with the support of his family, no public interest would be served by incarcerating

him any further.

**C.**    **The Advisory Guidelines Range is Disproportionate to Mr. Valencia's Culpability**

Finally, neither the seriousness of the offense nor the need for general deterrence requires a lengthy period of incarceration.  While drug crimes are serious, the drug offense levels set by the guidelines – which solely consider aggregate weight and type of drug – are not rooted in empirical evidence and largely fail to account for an individual's culpability.  *See, e.g.*, Patti B. Saris, Speech to Georgetown University Law Center: A Generational Shift for Drug Sentences (Mar. 26, 2014) ("drug sentences may now be longer than needed to advance the purposes for which we have prison sentences, including public safety, justice and deterrence"); *see also* Anthony M. Kennedy, Speech at A.B.A. Annual Meeting (Aug. 9, 2003) (criticizing the guidelines as "too severe" and called for a general, across-the-board reduction in guidelines sentences).  The Sentencing Commission itself has recognized the "'harshness and inflexibility' of the drug trafficking guideline . . . as the most significant problem with the sentencing guidelines system."   U.S. Sentencing Comm'n, Fifteen Years of Guidelines Sentencing 55 (Nov. 2004).  Courts in this district have also recognized that "the offense guideline for heroin, cocaine, and crack offenses ('drug trafficking offenses') is deeply and structurally flawed" because "they are driven by drug type and quantity, which are poor proxies for culpability." *United States v. Diaz*, 2013 WL 322243 (E.D.N.Y. Jan. 28, 2013) at *1; *id.* at *12 ("By importing the ADAA's weight-driven approach into the Guidelines ranges for drug trafficking offenses, the Commission accepted the ADAA's flawed premise that drug quantity is the predominant factor in determining a defendant's true culpability.").

19

The structural unfairness is particularly acute here, where Mr. Valencia's role was relatively minor and short lived and he was paid only a modest fee. Numerous district courts have stressed that "[d]rug quantity under the Guidelines treats as similar the drug dealers who stood to gain a substantial profit" and the lower-level workers "who receive[] little more than piecework wages." *United States v. Cabrera*, 567 F. Supp. 2d 271, 273 (D. Mass. 2008); *accord United States v. Johnson*, 279 F. Supp. 3d 1213, 1215–22 (M.D. Ala. 2019); *see also United States v. G.L.*, 305 F.R.D. 47, 51 (E.D.N.Y. 2015) ("Although the Sentencing Guidelines for drug crimes have been reduced, they are still excessive."). In light of these flaws in the Guidelines for drug trafficking offenses, the Court should accord them limited weight here and vary downwards from the advisory range. *See United States v. Goffer*, 721 F.3d 113, 131 (2d Cir. 2013) ("[A] district court may vary from the Guidelines range based solely on a policy disagreement with the Guidelines, even where that disagreement applies to a wide class of offenders or offenses." (citations and quotation marks omitted)).

## V.

## CONCLUSION

As Mr. Valencia will explain in his own words at sentencing, he is ashamed and remorseful. He recognizes the seriousness of his crime and makes no excuse. But given his long history of honest and hard work and his serious health conditions, we respectfully urge the Court to temper justice with mercy, and impose a sentence of time served.

Dated: New York, New York
         July 25, 2025

By:  /s/ *Justine A. Harris*

Justine A. Harris
HARRIS TRZASKOMA LLP
156 West 56th St., Suite 2004
New York, NY 10019
(917) 685-5622
Jharris@harristrz.com


Krista Staropoli
SHER TREMONTE LLP
90 Broad Street, 23rd Floor
New York, NY 10004
(212) 202-2600
kstaropoli@shertremonte.com


*Attorneys for Alexander Valencia Garcia*

21